# UNITED STATES DISTRICT COURT

for the
District of Colorado

In the Matter of the Search of

A BLACK APPLE IPHONE, UNKNOWN
SERIAL NUMBER, IMEI 356845113815987,
CURRENTLY IN THE CUSTODY OF THE
LAKEWOOD POLICE DEPARTMENT IN
LAKEWOOD, COLORADO TAKEN ON JUNE
10TH, 2022 AND BOOKED UNDER
LAKEWOOD POLICE PROPERTY ITEM
BARCODE L22017687 more fully described in
Attachment A, attached hereto.

)
)
)
)
)
)
)
)
)

Case No. 22-sw-00785-STV

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit
located in the _____ State and _____ District of _____ Colorado _____, there is now concealed *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit
The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in Possession of a Firearm |
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute Fentanyl |
| 18 U.S.C. § 924(c)(1)(A) | Carrying or Possessing a firearm in connection with a drug trafficking crime |

The application is based on these facts:
X Continued on the attached affidavit, which is incorporated by reference.

*s/Adam Omansky*
*Applicant's signature*

Adam Omansky, Special Agent, ATF
*Printed name and title*

Sworn to before me and: ☒ submitted, attested to, and acknowledged by reliable electronic means.

Date: _____ June 29, 2022 _____

*Judge's signature*

Scott T. Varholak, U.S. Magistrate Judge
*Printed name and title*

City and state: _____ Denver, CO _____

**ATTACHMENT A**

**DESCRIPTION OF LOCATION TO BE SEARCHED**

Daniel LOVATO's cellular phone (hereinafter and in Attachment B "**the Device** ")

1. BLACK APPLE IPHONE, UNKNOWN SERIAL NUMBER, IMEI 356845113815987, CURRENTLY IN THE CUSTODY OF THE LAKEWOOD POLICE DEPARTMENT IN LAKEWOOD, COLORADO TAKEN ON JUNE 10TH, 2022 AND BOOKED UNDER LAKEWOOD POLICE PROPERTY ITEM BARCODE L22017687



# ATTACHMENT B

## DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED

For the Device listed and described in Attachment A, the following items, which constitute evidence of the commission of, contraband, the fruits of crime, or instrumentalities of violations of 21 U.S.C. § 841(a)(1), 18 U.S.C. 922(g)(1), and 18 U.S.C. § 924(c)(1)(A) (the "Subject Offenses"):

1. The assigned telephone of the cellular phone or identifying information about the device (ESN, MIN, IMSI, or IMEI);

2. The electronically stored phone book or contact list;

3. The call log to include the record of incoming, outgoing, and missed calls;

4. Any and all information, ledgers, photographs, videos, spreadsheets, notes, software, documents, records, emails, text messages, programs, or other communications or correspondence, in any format and medium, pertaining to violations of the Subject Offenses;

5. Any and all information related to the purchase, production, sale, or manufacture of controlled substances;

6. Bank and financial institution records and other records of financial transactions related to the commission of the Subject Offenses;

7. Information tending to identify individuals engaging in the Subject Offenses, and their co-conspirators, such as address books, contact lists, and communication records and identification documents, personal calendars, planners, itineraries, and travel records;

8. Location data tending to show participating in the Subject Offenses, such as GPS data and cell site data;

9. Records of internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any internet search engine, and records of user-typed web addresses pertaining to the Subject Offenses.

10. Records of or information about Internet Protocol addresses used by the Device;

11. Information about usernames or any online accounts or email addresses;

12. Passwords, encryption keys, and other access devices that may be necessary to access the Device;

13. Evidence of who used, owned, or controlled the Device at the time the items described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, calendars, browsing history, user profiles, e-mail, e-mail contacts, "chat" or instant messaging logs, photographs, and correspondence;

14. Contextual information necessary to understand the evidence described in this attachment;

15. Social media applications present on the device, including Snapchat, Instagram and Facebook, as these applications may contain GPS and location information indicating where the phone has been used; photographs and/or videos showing the identity of the device owner/user, the identity of known and unknown coconspirators, discussions pertaining to narcotics or firearms, including the acquisition and distribution thereof, or identity theft.

16. Any and all financial records, including bank account or credit card account information, to include account applications, statements, receipts, checks, deposit slips, receipts, disbursement journals, record of cash transactions, money orders, cashier's check, check stubs, check registers and checking and savings account documents.

<u>DEFINITIONS</u>:

17. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

18. If the government becomes aware of a reasonable possibility that seized materials may include attorney-client privileged information, the government will implement filter protocols to safeguard attorney-client privileged materials and segregate those materials from review by any member of the investigative team.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Special Agent Adam Omansky of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

## INTRODUCTION AND AGENT BACKROUND

1.  Your Affiant, Adam Omansky, is a Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), United States Department of Justice, Denver, Colorado.  Your Affiant is an investigative or law enforcement officer of the United States, within the meaning of Title 18, United States Code, Section 2510(7), that is an officer of the United States empowered by law to conduct investigations of, and to make arrests for, offenses enumerated by statute in the United States Code, and the Colorado Statutory Code.  Your Affiant is authorized under the Federal Rules of Criminal Procedure, Rule 41(a)(1)(C) as a Federal law enforcement officer who is engaged in enforcing the criminal laws and is within any category of officers authorized by the Attorney General to request a search warrant.

2.  I have been employed by the ATF as a Special Agent since August of 2021. I am assigned to the Denver Field Division Group I. I have received training through the Federal Law Enforcement Training Center, located in Glynco, Georgia, to include, the Criminal Investigator Training Program, the ATF Special Agent Basic Training Program. I investigate violations of federal criminal statutes, including violations of federal firearms and narcotics laws. Prior to being a Special Agent with ATF I was a Police Agent with the Lakewood Police Department (LPD) in Lakewood Colorado for over 3 ½ years. As a Police Agent, I was assigned to the patrol division. My duties involved responding to calls for service and proactive policing. I have made over 140 felony and misdemeanor arrest during my tenure. I investigated numerous cases of possession of a weapon by a previous convicted felon, possession of a controlled substance with the intent to distribute, and other serious crimes.

3. This affidavit is submitted in support of an application for a search warrant for a black Apple iPhone, UNKNOWN SERIAL NUMBER, IMEI 356845113815987 cellular phone discovered in the possession of Daniel LOVATO (more fully described in Attachment A), and the data located therein, there being probable cause to believe that located in the place described in Attachment A are items described in Attachment B, being evidence, fruits, and instrumentalities of violations of violations of 21 U.S.C. § 841(a)(1), 18 U.S.C. 922(g)(1) and 18 U.S.C. § 924(c)(1)(A).

4. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 841(a)(1), 18 U.S.C. 922(g)(1) and 18 U.S.C. § 924(c)(1)(A) are located in the place described in Attachment A.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5. The property to be searched is a black Apple iPhone, unknown serial number, IMEI 356845113815987, seized on June 10th, 2022, by the Lakewood Police Department during an arrest at 5200 W. Colfax Ave. Lakewood, Colorado (hereinafter referred to as "the Device "). The Device is currently being maintained and kept safe in the custody of the Lakewood Police Department Property Unit, 445 S. Allison Street, Lakewood, Colorado In your affiant's training and experience, your affiant knows that the Device has been stored in a manner in which the contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the Lakewood Police Department.

6. The applied-for warrant would authorize the forensic examination of the devices described in **Attachment A (the Device)** for the electronically stored data and information as described in **Attachment B**.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

7.      Based on my training and experience, Your Affiant knows about the following items, hereinafter and below and in the Attachments the **Device.**

A.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

B.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer or electronic device attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers or electronic devices have static—that is, long-term—IP addresses, while other computers or electronic devices have dynamic—that is, frequently changed—IP addresses.

C.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least

four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

D.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

E.  Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

F.  Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include

various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

G. A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet including websites, social media sites, bulletin boards, file sharing, and other Internet sites. Wireless telephones often have a subscriber identity module or subscriber identification module ("SIM"), which is an integrated circuit that securely stores the International Mobile Subscriber Identity ("IMSI") and the related key used to identify and authenticate subscribers on mobile telephone devices. A SIM is embedded into a removable "SIM card," which can be transferred between different mobile devices. A SIM card contains a unique serial number ("ICCID"), IMSI, security authentication and ciphering information, temporary information related to the local network, a list of the services to which the user has access, and certain passwords. Most SIM cards will also store certain usage data, such as call history, text ("SMS") messages, and phone

book contacts. Such telephones may also contain removable storage media, such as a flash card—such devices can store any digital data, and can have the capacity to store many gigabytes of data. Wireless telephones may also be "smartphones," such that they operate as personal computers capable of accessing the Internet. They operate as Global Positioning System (generally abbreviated "GPS") devices and can store information about where they have been. They also contain digital cameras. The camera can mark a photo with location data so that upon examination it can be determined where and when a photo was taken. These images can sometimes be recovered even if the user has deleted the image. The smartphone can also connect to the internet using wireless connections, which allow for images, files and other information to be uploaded directly to the Internet or to other digital storage devices or computers. Smartphones also have software, giving them the same capabilities as personal computers including accessing and editing word processing documents, spreadsheets, and presentations. They can also operate as a "tablet," or mobile computer, and can contain software programs called applications. Those programs can perform different functions and save data associated with those functions, including use associated with the Internet. They also operate as personal digital assistants and have contacts and calendar functions. They also can contain media such as music and other files in large quantity.

8.     Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications, I know that the Device has capabilities that allow it to access the internet and also serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. Moreover, in my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the Device.

9.      Based on my knowledge, training, and experience, Your Affiant knows that computers and digital storage devices can store information for long periods of time. Similarly, things that have been searched for and viewed via the Internet are typically stored for some period of time on a device. This information can sometimes be recovered with forensic tools.

10.     Based on my knowledge, training, and experience, examining data stored on computers and digital storage devices can uncover, among other things, evidence that reveals or suggests who possessed or used the computer or digital storage devices.

11.     There is probable cause to believe that things that were once stored on the Device may still be stored there, for at least the following reasons:

A.   Based on my knowledge, training, and experience, I know that digital files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a digital storage device or computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

B.   Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, an operating system may also keep a record of deleted data in a "swap" or "recovery" file.

C.   Wholly apart from user-generated files, computer storage media including digital storage devices and computers' internal hard drives can contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations,

artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

D.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." Forensic review may also disclose when and by whom the Internet was used to conduct searches, view material, and communicate with others via the Internet.

12. *Forensic evidence*.  As further described in Attachment B, this application seeks permission to locate not only electronically stored information on the devices that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the device was used, the purpose of the use, who used the device, and when.  There is probable cause to believe that this forensic electronic evidence might be on the devices because:

A.  Data on the storage medium can provide evidence of a file that was once on the storage media but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer or device was in use. Digital storage devices' file systems can record information about the dates files were created and the sequence in which they were created.  This information can be recovered months

or even years after they have been downloaded onto the storage medium, deleted, or viewed.

B. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

C. A person with appropriate familiarity with how a digital storage device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

D. The process of identifying the exact electronically stored information on storage media that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a digital storage device is evidence may depend on other information stored on the digital storage device and the application of knowledge about how a computer or digital storage device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

E. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

F. Your Affiant knows that when an individual uses an electronic device to aid in the commission of a crime, particularly crimes involving drug distribution and unlawful possession of firearms the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a

storage medium for evidence of crime.  From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: calls and voicemails between suspects and co-conspirators ; text messages between suspects and co-conspirators; GPS searches and information associated with traveling in order to scout locations narcotics transactions; GPS searches and information associated with traveling in order to distribute narcotics; internet searches pertaining to targeted  locations, relating to narcotics and/or firearms; photographs and/or videos exchanged between an individual suspects and co-conspirators involved in, distributing narcotics and individuals attempting to purchase narcotics; social media apps such as Facebook or Instagram, where the phone owner may be communicating with others regarding narcotics or firearms; email accounts with emails containing communications of drug distribution and unlawful firearm possession.   Additionally, devices are often used to call, text, send photos and email information to criminal associates before, during, and after crimes to assist in the crimes both in planning, executing, and fleeing from the crime scene, and that information is likely contained in the memory of the cell phone.   In addition, people involved in the distribution of narcotics are likely to communicate using texts, email, or by phone to arrange to further their criminal activity.

G.  Your Affiant also knows that those who engage in criminal activity will attempt to conceal evidence of the activity by hiding files, by renaming the format, (such as saving a .pdf image file as a .doc document file) or by giving them deceptive names such that it is necessary to view the contents of each file to determine what it contains.

13.  *Need to review evidence over time and to maintain entirety of evidence*.  Your Affiant recognizes the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches. Your Affiant advises it would

be impractical and infeasible for the Government to review the mirrored images of digital

devices that are copied as a result of a search warrant issued pursuant to this Application during a

single analysis.  Your Affiant has learned through practical experience that various pieces of

evidence retrieved from digital devices in investigations of this sort often have unknown

probative value and linkage to other pieces of evidence in the investigation until they are

considered within the fluid, active, and ongoing investigation of the whole as it develops.  In

other words, the weight of each individual piece of the data fluctuates based upon additional

investigative measures undertaken, other documents under review and incorporation of evidence

into a consolidated whole.  Analysis is content-relational, and the importance of any associated

data may grow whenever further analysis is performed. The full scope and meaning of the whole

of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation

and correlation between pieces of an investigation as that investigation continues, looking at one

piece of information may lose its full evidentiary value if it is related to another piece of

information, yet its complement is not preserved along with the original.  In the past, your

Affiant has reviewed activity and data on digital devices pursuant to search warrants in the

course of ongoing criminal investigations.  Your Affiant has learned from that experience, as

well as other investigative efforts, that multiple reviews of the data at different times is necessary

to understand the full value of the information contained therein, and to determine whether it is

within the scope of the items sought in Attachment B.  In order to obtain the full picture and

meaning of the data from the information sought in Attachments A and B of this application, the

Government would need to maintain access to all of the resultant data, as the completeness and

potential of probative value of the data must be assessed within the full scope of the

investigation.  As such, your Affiant respectfully requests the ability to maintain the whole of the

data obtained as a result of the search warrant, and to maintain and to review the data in the

control and custody of the Government and law enforcement at times deemed necessary during

the investigation, rather than minimize the content to certain communications deemed important at one time.  As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

14.    *Nature of examination*.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, copying and reviewing the contents of the device consistent with the warrant.  The warrant I am applying for would authorize a later examination and perhaps repeated review of the device or information from a copy of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

## **INVESTIGATION**

15.    On June 10th, 2022, at approximately 0258 hours, LPD Agent Cassidy observed a red Chevy Cobalt exit the Big Bunny Motel located at 6218 W. Colfax Ave. Lakewood, Colorado. Agent Cassidy knows the Big Bunny Motel to be a high crime area known for the dealing of illegal narcotics and illegal narcotic use.

16.    Agent Cassidy observed the red Chevy Cobalt displayed temporary tag 4093439 which expired in May of 2022.  Agent Cassidy also observed that the driver-side side mirror was broken with no glass on it in violation of 42-4-226 Mirrors Violation.

17.    Agent Cassidy initiated a traffic stop on the vehicle at 5200 W. Colfax Ave. Lakewood, Colorado.  Daniel LOVATO (W/M, DOB: 12/10/92) was the driver and sole occupant of the vehicle. LOVATO provided his Colorado identification to Agent Cassidy and was positively identified.

18.    Agent Cassidy checked LOVATO through the National Crime Information Center (NCIC) and Colorado Crime Information Center (CCIC).  LOVATO was found to have two warrants for

his arrest.  The first warrant was out of Arapahoe County Sheriff's Office for failure to comply on a

felony domestic violence assault 2 strangulation case (D0032021R000910).  The second warrant was out

of Lakewood PD for failure to appear on a driving under revocation case (C0302021T00191).  Agent

Cassidy asked LOVATO to step out of the vehicle was taken into custody without incident.

19.     Agent Cassidy conducted research into LOVATO'S criminal history and found that

LOVATO was prohibited from possessing firearms and ammunition, with the following felony

convictions:

> People Of The State Of Colorado Vs. Lovato, Daniel T - 2018CR6438 - Denver District.
> Pled Guilty - At-risk Assault 3-knowing/reckless Injury (Class 6 felony).  Sentence date
> 12/17/2018;

> People Of The State Of Colorado Vs. Lovato, Daniel T - 2014CR4496 - Denver District.
> Pled Guilty - Vehicular Eluding (Class 5 Felony).  Sentence date 09/01/2017.

20.     LOVATO was searched incident to arrest.  A wad of cash with a blue rubber band around

it was found in his wallet totaling $5,591.00 and a second wad of cash in his back-left shorts pocket was

found totaling $1,025.00. LOVATO's black Apple iPhone (the Device) was found on his person.

21.     Agent Ehrlich approached LOVATO's vehicle and looked through the passenger side

window.  On the passenger side floorboard, just in front of the seat, was a small blue pill.  Based on

Agent Ehrlich's training and experience, he recognized the small pill due to its shape and color as

fentanyl. Specifically, fentanyl pills are commonly made with the imprint "M30" and are referred to as

"blues".  Seeing this pill in plain sight, a search of the car was conducted.

22.     Agent Daversa began the search in the front driver's seat area.  Agent Daversa opened the

top of the center console, and immediately saw a black pistol.  The pistol was later identified as a Glock

Model 43X 9mm pistol bearing serial number BLYY643 which was reported stolen to the Loveland

Police Department, Loveland, Colorado on 4/19/2022 under case number 22-2778.  Laying on top of this Glock was a Ziploc bag that contained eleven blue M30 pills, believed to be fentanyl.

23.     Agent Ehrlich checked under the front passenger seat and found a pistol with SCCY written on it.  It was later determined to be a SCCY Model CPX-2 9mm pistol bearing serial number C263009.  Agent Ehrlich searched the rear passenger side compartment of the car and saw a black duffel bag on the floorboard that was partially open.  Agent Ehrlich opened the bag slightly which revealed a Ruger SR45 pistol.  It was later determined to be a RUGER Model SR45 .45 caliber pistol bearing serial number 38066548 which was reported stolen to the Arvada Police Department Arvada, Colorado on 4/3/2022 under case number AR22-005345.

24.     Community Service Officer (CSO) Clement found inside the black duffel bag and photographed a white and grey colored Michael Kors purse, and 2 blue colored gallon sized zip-lock bags that contained what appeared to be Marijuana.  CSO Clement found inside the Michael Kors purse 2 stacks of folded up cash.  One of the stacks was folded with a yellow-colored rubber band, and the other stack was folded up with a red colored rubber band.  Also, inside the Michael Kors purse, CSO Clement photographed a zip-lock bag that contained additional 21 blue colored pills that had "M" and "30" imprinted on the sides, believed to be fentanyl.  Agent Ehrlich found a safe disguised as a book inside the black duffle bag.  Inside the safe Agent Ehrlich found a stack of money. In the black duffle bag Agent Ehrlich found empty Ziploc bags and a roll of aluminum foil.  Agent Ehrlich located a small black electronic scale in the glovebox.

25.     Large sums of money were located on LOVATO's person and in his vehicle.  The amounts were later counted as:

A. The large folded up stack of cash with the blue rubber band wrapped around it as mentioned above as being inside of LOVATO's wallet contained $5,591.00.

B. A large amount of loose cash that Agent Cassidy removed from LOVATO's person search incident to arrest totaled $1,025.00.

C. A Michael Kors hand purse which was in the black duffle bag contained two folded up stacks of cash.  One had a yellow rubber band wrapped around it and one had a red

rubber band wrapped around it.  The stack with the yellow rubber band totaled $905.00 and the stack with the red rubber band totaled $1,000.00.

D. A small safe disguised with a front the folds open and reads "The New English Dictionary," was discovered by Agent Ehrlich.  This safe contained a total of $10,004 in cash.

E. This totaled $18,525.00

26.  The weight of the blue M30 suspected fentanyl pills were as follows:

F. 21 blue M30 pills from inside the zip-lock bag inside Michael Kors purse – net weight of 2.27g

G. 11 blue M30 pills from inside the zip-lock bag inside the center console – net weight of 1.16g

H. 1 blue M30 pills from the floor of the passenger front seat – net weight of .12g

I. This totaled a net weight of 3.55g.

27.  The weight of the suspected marijuana

J. Bag #1 of Marijuana from inside the black colored bag on the floor of the rear passenger seat – net weight 13.93g

K. -Bag #2 of Marijuana from inside the black colored bag on the floor of the rear passenger seat – net weight 14.0g

L. This totaled a net weight of 27.93g

28.  Agent Cassidy advised LOVATO of his Miranda Rights at approximately 0345 hours to which LOVATO stated he understood his rights and wanted to speak with Agent Cassidy. LOVATO advised that the vehicle is his and that he is the primary driver of it with his girlfriend occasionally driving it.  LOVATO advised that the property inside the vehicle should all be his.  Agent Cassidy asked LOVATO if he was worried about police searching his car because of the firearms.  LOVATO replied, "yes".  Agent Cassidy asked LOVATO if he was worried because LOVATO knew he was not supposed to have firearms.  LOVATO replied, "well I am a felon".

29.  Agent Cassidy tells LOVATO they found more fentanyl in the middle right with his firearm.  LOAVTO states, "yeah um they were in the middle?".  Agent Cassidy confirms that he was speaking to the firearm and fentanyl pills in the center console. LOVATO states that he thought Agent Cassidy was talking about the one on the floorboards.  Agent Cassidy tells LOAVTO that the additional

fentanyl was found with the gun in the "middle" (referring to the center console) and in Agent Cassidy's experience individuals who keep their illegal narcotics with their firearms often are dealing the illegal narcotics. LOVATO states that he could understand how it looks that way. LOVATO then states, "I just have the pieces" just to have them for protection.

30.     Agent Cassidy asked LOVATO where he got the firearms from. LOVATO already told Agent Cassidy he is a felon and stated he bought them from some guys on the streets and did not get them from a store. LOVATO stated two unknown Hispanic males "hit him up". LOVATO said he had never met the males before. LOVATO said he bought one firearm about 1 ½ months ago at the 7-Eleven located at 5200 W. Colfax Ave. Lakewood, Colorado. LOVATO said he bought the other pistol one month ago by the 7-Eleven located at W. Colfax Ave. and Perry St. in Denver, Colorado. LOVATO said he paid $450 dollars per pistol. LOVATO admitted to buying two of the pistols found in his vehicle.

31.     Your affiant, SA Omansky, reviewed the jail phone calls made from within the Jefferson County Sheriff Detention made by LOVATO while held in custody.

32.     On 6/10/22 at about 0942 hours LOVATO called Amber Murrietta (W/F DOB: 04/09/1992) at 720-791-7264. At about 3:35 minutes in the call LOVATO tells her to get the blues that he has and take them (inaudible). LOVATO states that they (Lakewood Police Department) took his phone. LOVATO instructs Amber to use her phone to log onto his Apple ID. Amber tells LOVATO "I told you no late-night jobs". LOVATO said it was stupid and he should not have gone. Amber asks LOVATO if all they found was 30 and he replies "yeah". LOVATO was found in possession of 33 suspected fentanyl pills. Based on SA Omansky's training and experience fentanyl pills are commonly made to look like blue oxycodone pills with the imprint "M30" and are referred to as "blues". LOVATO tells Amber that they (Lakewood Police Department) found the guns (firearms) too.

33.     On 6/10/22 at about 0948 hours LOVATO called Amber at 720-791-7264. Amber tells LOVATO that she told him not to do any more "late night runs". At about 4:13 minutes in the call

Amber says that Marcos is asking if there is anything he can do. LOVATO says not really but directs Amber to go by "Mike's" house by his mother's (Antonia) address. LOVATO states that Mike's mom owes "fifty". LOVATO directs Amber to collect it.

34.     On 6/10/22 at about 1255 hours LOVATO called Amber at 720-791-7264. At about 13:28 minutes in the call Amber tells LOVATO he should have listened to her and "stop doing drops after ten".

35.     Based upon the above evidence and my training and experience, there is probable cause to believe  LOVATO was engaging in the trafficking of narcotics and his cell phone holds evidence of the crime. With regards to narcotics trafficking, LOVATO was arrested with three (3) loaded pistols, over eighteen (18) thousand in US currency, a scale, roll of unused aluminum foil, a box of Zip-Lock baggies, 33 pills believed to be fentanyl, and marijuana. LOVATO's money was found rubber banded in large sums separately throughout the vehicle and on his person. LOVATO stated that the pistols were for his protection. Based on my training and experience drug dealers carry firearms to protect themselves from being robbed while they deal illegal narcotics. Drug dealers also separate their money from their deals in different locations to limit their loss if they are robbed. Scales are used to weigh the illegal narcotics and they packaged them in baggies for sale. I know fentanyl is commonly smoked using squares of aluminum foil by heating underneath the foil with a heat source causing distinct burn patterns on the foil as the blue fentanyl pill lets off gases which are inhaled using other drug paraphernalia devices. Fentanyl dealers commonly have foil to sell with the fentanyl pills for their customers. Accordingly, a person in possession of 33 fentanyl pills along with scales, plastic bags, over 18 thousand dollars in cash, and loaded firearms, is consistent with a person distributing the narcotic.

36.     Further support for this conclusion comes from the jail calls. Where Amber complained that she warned LOVATO several times not to do any more night "drops." LOVATO replied he should not have gone and they discussed that he only was caught with "30" pills. Although LOVATO was caught

with 33 fentanyl pills, their conversation implied that LOVATO was in possession of more, and that he had completed more than just one "drop."

37.     In my training and experience a "drop" is slang for when a person drops off a large load of narcotics. Due to the amount of narcotics involved, these types of transactions often yield a higher amount of cash being exchanged to the person dropping off the drugs. Thus, the jail calls along with the evidence recovered during his arrest, tend to show LOVATO was trafficking narcotics not only on the night of his arrest, but had been doing so over a longer period of time.

38.     Furthermore, I know drug dealers use cellular phones to aid in their crime. Specifically, cellular phones are used to communicate with buyers along with a dealer's source of supply. Cellular phones may also hold video and photographic evidence of the crime, in that narcotic traffickers take photographs or videos of drugs they are selling to send to buyers, or receive photos or videos of narcotics from their suppliers. They also may use their cellular phone to communicate with their buyers and suppliers, along with posting pictures/videos of narcotics, and/or the fruits of the crime such as money, through social media platforms like Facebook and Instagram. In this case specifically, the above evidence indicates that LOVATO had just completed a "drop" at the time of his arrest. Considering the Device found on his person was the only phone discovered during his arrest, he was likely using it to aid him in his narcotics trafficking.

## CONCLUSION AND REQUEST

39.     Based on the information contained in this affidavit, it is your Affiant's belief that there is probable cause to believe that contained within the **Device**, (described on Attachment A), there exists evidence of the commission of, contraband, the fruits of crime, or instrumentalities of violations of 21

U.S.C. § 841(a)(1), 18 U.S.C. 922(g)(1), and 18 U.S.C. § 924(c)(1)(A) U.S.C. § 841(a)(1), 18 U.S.C. 922(g)(1) and 18 U.S.C. § 924(c)(1)(A) (described on Attachment B).

40.      Therefore, your Affiant respectfully requests that this court issue a Search Warrant for the Device described more fully in Attachment A, to search for the items described in Attachment B.

I, Adam Omansky, being duly sworn, depose and states under penalty of perjury that the facts stated in the foregoing affidavit are true and correct to the best of my knowledge, information, and belief.

_s/Adam Omansky_
Adam Omansky, Special Agent
ATF

SUBSCRIBED and SWORN before me this _29th_ day of _June_ 2022

_____
UNITED STATES MAGISTRATE JUDGE

Application for search warrant was reviewed and is submitted by Thomas Minser, Assistant United States Attorney.